ISHEE, J.,
 

 for the Court:
 

 ¶ 1. Janice Ervin (Janice) died of a pulmonary embolism shortly after a hysterectomy was performed on her in October 2004 at Delta Regional Medical Center (DRMC). Her husband, Curtis Ervin (Curtis), filed a wrongful-death action on behalf of himself, his three children, and Janice’s estate against Dr. James Beck-ham.
 
 [1]
 
 Once suit was filed, it was discovered that Dr. Beckham worked for DRMC, the party who is ultimately responsible for his actions. After a bench trial, the Circuit Court of Washington County entered a judgment against Curtis and in favor of DRMC. Finding no error, we affirm.
 

 FACTS
 

 ¶ 2. Early in 2004, Janice began to experience pelvic pain and heavy bleeding from irregular periods, which in turn made her anemic. The test results following a CT scan suggested uterine fibroid tumors. After hormone-therapy treatment failed to resolve her health issues, her gynecologist, Dr. Beckham, recommended surgery to remove both her uterus and the fibroids. After discussing the procedure, the risks involved, and the benefits of the surgery with Dr. Beckham, the Ervins agreed the procedure was reasonable and necessary, and they gave their informed consent to Dr. Beckham.
 

 ¶ 3. On October 15, 2004, Dr. Beckham prepared Janice for a vaginal hysterectomy. However, upon examination of Janice in the operating room, and while Janice was under anaesthesia, it was determined by Dr. Beckham that due to adhesions from prior surgeries, an open abdominal hysterectomy would be necessary. Janice’s surgery lasted one hour and twenty-five minutes, but she was under anaesthe-sia for one hour and fifty-five minutes. After a successful surgery, Janice was returned to her hospital room. Dr. Beck-ham’s post-surgery orders included having Janice turn, cough, and take deep breaths every two hours. He further ordered bed-rest for Janice until the following morning. Dr. Beckham never ordered the use of any prophylactic measures, which, presumably, would have reduced the risk of deep vein thrombosis (DVT) or pulmonary embolism
 
 *192
 
 (PE), both of which are known complications of hysterectomy surgery.
 

 ¶ 4. The following morning, October 16, 2004, Dr. Beckham ordered Janice’s catheter be discontinued and ordered her to ambulate to the extent it could be tolerated. The catheter was immediately removed. Janice was then helped by a nurse’s aid to the bathroom. While in the bathroom, Janice called out to her husband, who was with her in the hospital room. He opened the door, and she collapsed in his arms. The nurse’s aid pulled the call light, and the nursing staff responded immediately. Janice, who was noted as being cold, clammy, and short of breath, was placed back in her bed. The nursing staff notified Dr. Beckham who promptly returned to Janice’s room. The staff additionally notified Josh Edwards, the nursing supervisor, who also reported to the room.
 

 ¶ 5. After Dr. Beckham evaluated Janice’s condition, he ordered that she be transferred to the intensive care unit (ICU). The nursing staff secured her and, with supplemental oxygen via a mobile oxygen bottle, transferred Janice to the ICU. Once the staff and Janice reached the ICU floor, Janice’s breathing had deteriorated even more, prompting the nursing staff to obtain a bag valve mask from the wall of the ICU. The staff then began to implement assisted respirations via a bag valve mask as Janice was being rolled into the ICU. Upon arrival in the doors of the ICU, a Code Blue was initiated. It was at this point that Dr. Beckham gave control to Dr. Parvez Karim. In an attempt to restore her breathing, Janice was given lOOmg of Activase, which is known to dissolve pulmonary emboli.
 

 ¶ 6. After an extended period, Janice’s heartbeat returned, but she remained unconscious and unable to react to painful stimuli. She was able to breathe only because she was placed on a ventilator. While there is some disagreement as to the origin and form of the clot and embolism which she had, it is undisputed that Janice died as a result of
 
 some
 
 form of clot or embolism which traveled to her lung, caused her to stop breathing, and eventually caused her heart to stop.
 

 ¶ 7. Despite the best efforts of her doctors, Janice’s condition continued to worsen as she suffered multiple organ failures and eventually brain death. On the morning of October 18, three days after her hysterectomy, and after a discussion between her family and her doctor, Janice was pulled from life support and was pronounced dead. She was forty years old.
 

 PROCEDURAL HISTORY
 

 ¶ 8. On September 6, 2005, Curtis, on behalf of himself, his family, and Janice’s estate, filed suit against DRMC, Dr. Beck-ham, and other DRMC employees alleging negligence. On April 21-23, 2008, the case was tried in the Circuit Court of Washington County, Mississippi. As DRMC is a community hospital entitled to the limitations, protections, and immunities of the Mississippi Tort Claims Act, the trial was conducted as a bench trial, heard before the Honorable Richard A. Smith. On October 14, 2008, the circuit court entered findings of fact and conclusions of law in favor of DRMC. Aggrieved, Curtis, on behalf of his family and Janice’s estate, timely filed this appeal.
 

 STANDARD OF REVIEW
 

 ¶ 9. Because Curtis’s appeal speaks to the weight of the evidence and the factual determinations made by the trial judge as the sole trier of fact in a bench trial, the standard of review for such factual determinations is “the substantial[-]evidence standard.”
 
 Covington County v. G.W.,
 
 767 So.2d 187, 189 (¶ 4) (Miss.2000). The find
 
 *193
 
 ings of the trial judge will not be disturbed unless the judge “abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.”
 
 Id.
 
 “A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor,” and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence.
 
 Puckett v. Stuckey,
 
 633 So.2d 978, 982 (Miss.1993);
 
 Sweet Home Water & Sewer Ass’n v. Lexington Estates, Ltd.,
 
 613 So.2d 864, 872 (Miss.1993);
 
 Allied Steel Corp. v. Cooper,
 
 607 So.2d 113, 119 (Miss.1992).
 

 ANALYSIS
 

 I. Nationally-Recognized Standard of Care
 

 ¶ 10. The circuit court found that Curtis failed to establish a nationally-recognized standard of care as to the use of sequential compression devices. In medical-malpractice cases, the Mississippi Supreme Court has stated that:
 

 As a result of its resources-based component, the physician’s non-delegable duty of care is this: given the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options.
 

 The burden was on Curtis to establish a nationally-recognized standard of care and the breach of that standard. Although Dr. Harold Miller (Curtis’s expert) felt that Dr. Beckham did not follow the standard of care for low-risk patients, the circuit court found that Dr. Miller offered no peer-review literature to support his position and that he also offered no literature or studies to support that his position is the nationally-recognized standard of care. The circuit court further found that, at most, Curtis’s expert showed “two schools of thought” as to whether or not prophylactic measures prior to and after gynecological surgery with low-risk patients should be used.
 

 ¶ 11. As we have noted, it is the responsibility of the circuit judge, when sitting as the trier of fact, to determine the credibility of witnesses, and his conclusions will not be disturbed if they are found to be supported by substantial, credible, and reasonable evidence.
 
 Puckett,
 
 633 So.2d at 982. Based on our standard of review we find no basis to disturb the circuit court’s findings. This issue is without merit.
 

 II. Janice’s Risk
 

 ¶ 12. Dr. Beckham, Janice’s gynecologist, and two other experts, Drs. Carl Reddix and Edward Rigdon, all testified that Janice was a low-risk patient because she was forty years of age; she had no history of cancer or radiation therapy; and she had no prior history of blood clots. On the other hand, the plaintiffs expert, Dr. Miller, argued that because Janice was undergoing a surgery that lasted for more than forty minutes and because she was on birth control pills (estrogen treatment) at the time of the surgery, she was not a low-risk patient.
 

 ¶ 13. The circuit court, in its findings of fact, agreed -with Drs. Beckham’s, Red-dix’s, and Rigdon’s assessments of Janice as a low-risk patient for developing pulmonary embolism. The circuit court referred to the
 
 ACOG Practice Bulletin
 
 which supported the doctors’ classifications of low risk. Further, the circuit court found that Dr. Miller, the plaintiffs expert, failed to
 
 *194
 
 testify that Janice was actually a moderate-risk or high-risk patient. The circuit court found that Dr. Miller testified that Janice merely was not a low-risk patient.
 

 ¶ 14. Curtis takes issue with regard to the classification of Janice as a low-risk patient for developing DVT/PE, and he contends circuit court judge was clearly erroneous in finding Janice to be such. Had Janice been classified as a moderate-risk or high-risk patient, any type of compression devices, such as TED hoses or sequential compression devices, should have been used to help prevent the possibility of blood clot development.
 

 ¶ 15. We find that this argument is without merit. Essentially, Curtis has asked this Court to re-weigh the credibility of the witnesses. This exceeds the scope of our review, because “the trial judge, sitting in a bench tidal as the trier of fact, has sole authority for determining [the] credibility of the witnesses.”
 
 Johns v. State,
 
 926 So.2d 188, 194 (¶29) (Miss.2006) (citing
 
 Mullins v. Ratcliff,
 
 515 So.2d 1183, 1189 (Miss.1987)). Because the standard is one of such limited scope, we are forced to accept the circuit court’s finding that Janice was, indeed, a low-risk patient.
 

 III. Trial by Ambush and Nurse’s Standard of Care
 

 ¶ 16. Next, Curtis argues that it was unfair to allow the use of an errata sheet correcting an error in the deposition testimony of Nurse Natalie Reed (Reed). The circuit court judge addressed this issue when he also addressed the nurse’s standard of care. In the findings of fact, the circuit court found that even if Curtis were given the benefit of Reed’s testimony (that Janice was transferred without supplemental oxygen), the remaining testimony and evidence still showed and proved the contrary. The circuit court found that the respiratory therapy notes, ICU notes, and Code Blue flow sheet reflected that Janice was provided supplemental oxygen while being transferred to the ICU. Because the circuit court’s findings are supported by substantial, credible, and reasonable evidence, we find that this issue is without merit.
 

 IY. Causation
 

 ¶ 17. Finally, Curtis takes issue with the circuit court’s finding that he failed to prove causation. In other words, the circuit court found that Curtis failed to show that Janice’s pulmonary embolus originated in her leg; therefore, even if Dr. Beckham had followed Dr. Miller’s stated standard of care in regard to compression devices, applying a compression device to Janice’s legs would not have prevented the embolus from forming in her pelvis and her ultimate death.
 

 ¶ 18. Both of the defendant’s experts opined and supported their opinions that the pulmonary embolus in this case originated in the pelvis, not in the leg. All experts agreed that mechanical devices (compression devices) would not have prevented the formation of the blood clot in the pelvis. Once again, because the circuit court’s findings are supported by substantial, credible, and reasonable evidence, the findings must be affirmed. This issue is without merit.
 

 ¶ 19. THE JUDGMENT OF THE WASHINGTON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., MYERS, P.J., IRVING, GRIFFIS, BARNES, ROBERTS AND MAXWELL, JJ„ CONCUR. LEE, P.J., AND CARLTON, J., NOT PARTICIPATING.
 

 [1]
 

 . The appellant will be referred to as Curtis unless it is necessary to distinguish.